IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TAMMIE D. D.[1]                          )
                                         )
                        Plaintiff,       )
                                         )
vs.                                      )        Case No. 17-cv-01003-CJP[2]
                                         )
COMMISSIONER OF SOCIAL                   )
SECURITY,                                )
                                         )
                        Defendant.       )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Tammie D. D. (Plaintiff) seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI on June 21, 2013, alleging a disability onset date of March 21, 2013. (Tr. 204-16). Plaintiff's application was denied at the initial level and again upon reconsideration. (Tr. 112-13; 137-40). Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Joseph Heimann conducted on July 21, 2016. (Tr. 36-95). ALJ Heimann reached an unfavorable decision on September 30, 2016. (Tr. 13-24). The Appeals Council

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. See, FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). (Doc. 28).

denied Plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-3). Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff asserts the ALJ's disability determination was erroneous because he failed to articulate how long Plaintiff could walk throughout the workday; did not properly evaluate medical evidence in determining her RFC; and omitted Plaintiff's anxiety diagnosis from his analysis at Step 2. Alternatively, Plaintiff asserts the ALJ should have found her disabled for a closed period.

## Applicable Legal Standards

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.  The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement.  The third step compares the impairment to a list of impairments that are considered conclusively disabling.  If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.  The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.  If an applicant can engage in past relevant work, he is not disabled.  The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.  If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th

Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The ALJ's Decision**

ALJ Heimann determined Plaintiff met the insured status requirements through June 30, 2017 and had not engaged in substantial gainful activity since March 21, 2013, the alleged onset date. (Tr. 15). Plaintiff had severe impairments of status post-bilateral carpal tunnel syndrome; emphysema; status post right hip replacement; degenerative joint disease of the left knee with meniscus tear; osteoporosis; and right heel spur. (Tr. 15-16). Plaintiff had the RFC to perform light work, except that she could only "stand and walk" four hours out of an eight-hour workday. Plaintiff was additionally limited to occasionally performing foot control operations bilaterally. Moreover, she could never climb ladders, ropes, or scaffolds, kneel, or crawl. Plaintiff could occasionally climb ramps and stairs, stoop, and crouch, and had to avoid

exposure to concentrated levels of irritants. (Tr. 17). The ALJ determined Plaintiff could perform past relevant work and was therefore not disabled. (Tr. 23-24).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### 1. Agency Forms

In her agency forms, Plaintiff stated heel spurs, heart disease, a back injury, depression, emphysema, and carpel tunnel syndrome limited her ability to work. (Tr. 236). Plaintiff was most recently employed as a cashier at a grocery store. (Tr. 237). She alleged she was unable to continue her employment because it required her to be on her feet at all times. She experienced extreme pain in her feet, ankles, legs, back, hips, hands, and wrists and was "useless" after work. (Tr. 269). On an average day, Plaintiff had breakfast and rested before work, with her legs elevated. On days she did not work, she rested with Icy Hot cream on her feet, legs, back, and neck. Pain kept her awake at night. She had difficulty dressing and using stairs, and kept a chair in her bathroom to get in and out of her bathtub. (Tr. 270). Plaintiff could not prepare meals because it hurt to stand. (Tr. 271). She did laundry once each week and could grocery shop but did not do any other house or yard work because it was too painful. (Tr. 271-72). Plaintiff was able to drive. Her hobbies included reading and watching

television. (Tr. 273). Plaintiff could walk a half a block before needing to stop and rest. She could pay attention for fifteen minutes, followed spoken and written instructions fairly well, got along with authority figures "fine," and handled stress fairly well, unless she was in pain. She used a cane to do laundry but it was not prescribed to her by a physician. (Tr. 274-75). Plaintiff stated she could not sit for even two hours because of pain. (Tr. 279).

### 2. Evidentiary Hearing

ALJ Heimann conducted an evidentiary hearing in July 2016, at which Plaintiff was represented by counsel. (Tr. 39). Before commencing the hearing, the ALJ went over the exhibits and medical records with Plaintiff and her counsel. (Tr. 40-42). The ALJ asked, "Counsel, you're satisfied the record is complete?" Plaintiff's counsel responded, "No objection. I'm awaiting records from Dr. Morton, who's an orthopedic doctor, who had replaced her hip and had taken some fluid off of her knee. And she's about to go back and obtain some additional information." (Tr. 40-41).

Plaintiff then testified that she lived in a house near her parents, who helped her with cooking, laundry, and other housework. (Tr. 43). She sometimes went days without eating because of depression and anxiety. (Tr. 44). Plaintiff's arm was bothering her during the hearing and she could not use it. She planned to see an orthopedist for treatment. (Tr. 44-45). Plaintiff had insurance through the Affordable Care Act, which Plaintiff's attorney described as the "Tin plan." (Tr. 45).

Plaintiff last worked one year prior to the hearing as a cashier at a grocery store. (Tr. 46). She had problems performing her duties because of pain in her wrists, back, heels, and feet. (Tr. 47-48). Plaintiff's doctor diagnosed her with heel spurs and recommended surgery, but her insurance would not authorize the procedure. (Tr. 48). If money was not an object, she would undergo the surgery. (Tr. 65). Plaintiff's carpal tunnel was also "acting up" and her shoulder was "shot." Plaintiff's shoulder problems began about two weeks before the hearing. (Tr. 50). She had bulging discs in her back but did not receive any treatment for them. She initially declined physical therapy but indicated at the hearing she changed her mind. Plaintiff also had a cyst and fluid in her knee. (Tr. 52-53). Plaintiff underwent a right hip replacement in January 2015. Her hip bothered her from time to time. For instance, she had recently jogged around the grocery store and was sore for four days afterwards. Plaintiff could stand for about an hour before hurting. She took prescription strength Tylenol but only when "absolutely necessary." (Tr. 54-56).

Plaintiff had difficulty sleeping and had small panic attacks in the afternoons. (Tr. 57). She took Xanax for mental health problems, but believed if she did not have physical ailments she would be able to work, even with depression. (Tr. 67-68).

Plaintiff underwent carpal tunnel release surgeries, which she agreed were successful. She did not have any problems using her hands following the surgeries. (Tr. 57-58).

Plaintiff spent half of her day in a reclined position to accommodate physical discomfort. She did not think she could stand, continuously, for an hour. (Tr. 71-72). She also had difficulty sitting for long period. (Tr. 67).

Plaintiff stated she previously worked in St. Clair County's Health Department, which required less than two hours of standing each day. She did not think she could return to that position because she needed to be able to stand often to stretch her legs. (Tr. 83-88). The vocational expert (VE) who also testified at the hearing classified this job as a "traffic clerk," which is a sedentary job according to the Dictionary of Occupational Titles. (Tr. 89). The VE opined that a hypothetical person with Plaintiff's ultimate RFC could perform the job as a traffic clerk. (Tr. 90-91).

### 3. Medical Records

Plaintiff has a history of coronary artery disease, ischemic heart disease, dyslipidemia, and hypertension. (Tr. 440-42). However, Plaintiff's cardiologist opined she had no work-related limitations from a cardiac standpoint and she raises no arguments related to her heart condition. (Tr. 459). Plaintiff's arguments and the following summary revolve around her issues with heel spurs, carpal tunnel syndrome, osteoarthritis, low back pain, and anxiety.

On April 17, 2013, Dr. Mitchell Needleman, Plaintiff's podiatrist, completed a medical source statement, opining Plaintiff could only work for four hours every three days due to severe pain in her feet. (Tr. 427).

Dr. Needleman drafted another statement on May 6, 2013, in which he stated he had evaluated Plaintiff on two occasions for severe pain in her right foot due to a large spur, and pain in her Achilles tendon. Plaintiff experienced pain any time she was on her feet and wearing shoe gear, which may have been related to standing on hard concrete floors at work. Dr. Needleman explained Plaintiff had severe pain on palpation of the back of her right heel at the spur, when she moved her ankle joint up and down, and when she pulled her Achilles tendon on the heel bone. Plaintiff tried padding, which did not significantly relieve her symptoms. The only time she felt relief was when she was off her feet. Dr. Needleman noted that surgery was the only treatment that would help Plaintiff. Otherwise, Plaintiff needed a job "where she [could] sit all day and be off of her feet." Dr. Needleman opined Plaintiff may benefit from disability as well. (Tr. 430).

Dr. Needleman completed an arthritic report in August 2013, in which he opined Plaintiff needed a job that permitted her to shift positions at will between sitting, standing, and walking. (Tr. 435).

On September 19, 2013, Dr. Needleman stated he had evaluated Plaintiff three times and she continued to experience severe pain in her right heel due to large heel spurs. Plaintiff could not wear regular shoes and she experienced pain when ambulating due to decreased range of motion in the ankle joint. Conservative care had not helped and Dr. Needleman recommended surgery. He opined that she need to be on disability "for the time being" due to her inability to

stand or walk. Plaintiff also reported back pain and walked with difficulty due to her foot pain. (Tr. 465).

State agency consultant Dr. Vittal Chapa evaluated Plaintiff on October 24, 2013. Plaintiff reported leg cramps, pain in her hips, bone spurs on her spine, left thumb, and heels, pinched nerves in her neck, and carpal tunnel syndrome. She took oxycodone for pain. On examination, Plaintiff was able to ambulate and bear weight without assistance. She demonstrated a normal gait and normal lumbosacral spine flexion. Her straight leg raise test was negative bilaterally and she had full range of motion of the joints. She was able to perform both fine and gross manipulations with both hands and her handgrips were 4/5 in both hands. She had no difficulty getting on and off the exam table. There was no muscle atrophy. Her ankle reflexes were absent. Dr. Chapa noted bone spurs on the posterior aspects of her heels. He diagnosed Plaintiff with bilateral calcaneal heel spurs and bilateral carpal tunnel syndrome. (Tr. 467-69).

Plaintiff visited Dr. Pavan Kumar Gupta on February 7, 2014 and reported chest discomfort. Dr. Gupta noted that Plaintiff walked her dog every day without issue. (Tr. 740-41).

On May 1, 2014, Dr. Needleman completed a medical certification for Plaintiff's work and noted that Plaintiff had severe pain due to heel spurs. Dr. Needleman stated Plaintiff was incapacitated but could return to work "any time she [had] no pain." He suggested she could not be on her feet. He opined her

condition began in January 2013 and was expected to continue for approximately 15 months. (Tr. 515-17).

Plaintiff consulted Dr. Harvey Mirly from Belleville Hand Surgery on June 26, 2014. Plaintiff complained of carpal tunnel syndrome with nocturnal paresthesias and morning pain. She described her hands falling asleep and going numb, and experiencing radiating proximal pain. On examination, there was no thenar atrophy and she had well-preserved strength of the abductor pollicis brevis. She had markedly positive carpal tunnel provocative testing. Dr. Mirly fitted Plaintiff with bilateral wrist cock-up splints for nighttime wear and recommended obtaining a nerve conduction study. Dr. Mirly discussed Plaintiff's treatment options, which included the splint wear and intratunnel injections or an operative release. (Tr. 519).

Plaintiff followed-up with Dr. Gupta on September 2, 2014. She reported experiencing shortness of breath after going on a four-mile bicycle ride. (Tr. 735-36).

Dr. William Strecker performed an independent medical evaluation of Plaintiff on October 6, 2014. Plaintiff reported numbness and tingling in her hands and pain that woke her from sleep. After examination and a review of Plaintiff's medical history, Dr. Strecker opined Plaintiff had carpal tunnel syndrome. He also suggested a nerve conduction study to confirm the diagnosis. He opined Plaintiff was capable of full duty pending any further evaluation or treatment. (Tr. 524-27).

Plaintiff underwent a nerve conduction study on October 8, 2014. She had intermittent pain, numbness, and tingling in her hands and fingers for about one year. On physical examination, she demonstrated normal manual motor testing and sensory examination in both upper extremities. Tinel's test was positive at the wrists. The physician stated it was a technically difficult study due to Plaintiff's poor test tolerance. He further noted electro diagnostic evidence of a bilateral median motor sensory focal distal neuropathy at the wrist, which could represent bilateral carpal tunnel syndrome. Findings were mild on the left and mild to moderate on the right. The needle EMG examination of plaintiff's muscles of the bilateral upper extremities was normal. (Tr. 563-64).

Plaintiff followed-up with Dr. Needleman on October 27, 2014. He noted Plaintiff's heel spurs and symptoms were present for about a year and a half and had been progressively worsening over the previous few months. Plaintiff had tried heel lifts, magnets, massage, conservative care, and pain pills with no relief. Dr. Needleman discussed cortisone injections and surgery, but Plaintiff declined. She received a prescription for Percocet. (Tr. 615).

Plaintiff was treated for a low back strain at St. Elizabeth's Hospital on November 5, 2014. She was instructed to apply ice to her injury and she received a prescription for ibuprofen and a muscle relaxant. (Tr. 529).

Plaintiff underwent right open carpal tunnel release on November 10, 2014, (Tr. 575-80), and left open carpal tunnel release on December 8, 2014. (Tr. 581-

84). Dr. Mirly, Plaintiff's surgeon, released Plaintiff to work on January 19, 2015. (Tr. 601).

Plaintiff saw Dr. Needleman on December 18, 2014. She complained of pain at the posterior aspects of her heels, bilaterally. Dr. Needleman suggested cortisone injections, heel lifts, orthotics, ice, heat, and topical products. He stated that if nothing helped, she might need surgery. Dr. Needleman prescribed Plaintiff Percocet. (Tr. 613).

An MRI of Plaintiff's right hip from May 4, 2015 demonstrated mild lumbar spondylosis with disc bulge at L4-L5, resulting in mild foraminal and spinal stenosis. (Tr. 547-48). An MRI of her lumbar spine showed mild right hip osteoarthritis and a small subchondral fracture superiorly on the right femoral head with associated profound marrow edema. (Tr. 549-50).

Plaintiff underwent a total right hip arthroplasty in July 2015. (Tr. 663-64). Her physician restricted her to activity and weightbearing as tolerated, progressive range of motion and strengthening, no driving, and no heavy lifting. Plaintiff was prescribed OxyContin, Narco, Ultram, and Zofran. (Tr. 552-54). By August 2015, Plaintiff stated she was a little sore but walked well without any assistive devices, did not have an antalgic gait, and had no pain. X-rays showed the prosthesis in good position and alignment. (Tr. 658).

Plaintiff followed-up with Dr. Needleman on September 2, 2015. She stated she wanted to undergo surgery for her heel spurs when she got insurance. Dr. Needleman noted her condition had been present for a few years and had not

changed. She continued to have pain on palpation of the posterior aspect of the heels, bilaterally. He instructed Plaintiff to use Biofreeze, ice, and heat. He also prescribed her Tylenol with codeine to take as needed. (Tr. 614).

Dr. Michael Herrmann, Plaintiff's gynecologist, drafted a statement on April 11, 2016, stating he had treated Plaintiff since August 8, 2000 for anxiety and depression, for which she took Celexa and Xanax. Her symptoms reportedly became progressively more severe over the previous year. Dr. Herrmann noted Plaintiff had symptoms of chronic depression with insomnia. He did not anticipate that Plaintiff would ever be able to return to work. (Tr. 618).

Plaintiff received primary care from Dr. Muhiyuddin Khalid from October 2015 through April 2016. Dr. Khalid noted that Plaintiff did well following her hip replacement and demonstrated improvement in her gait and pain by December 2015. (Tr. 637-38). Plaintiff had problems with her knees and back, and MRIs from this period showed mild lumbar spondylosis and a meniscus tear. Dr. Muhiyuddin diagnosed Plaintiff with hypertension, osteoarthritis of the hip and knees, degenerative disc disease, and a medial meniscus tear. He prescribed Plaintiff Tylenol with codeine and prednisone and recommended physical therapy. (Tr. 627-45).

Plaintiff presented to Dr. Steven Morton at Memorial Medical Group on April 18, 2016 with pain and swelling in her left knee. An x-ray showed joint space narrowing of the patellofemoral joint medially. Dr. Morton diagnosed her with primary osteoarthritis of the left knee, started her on Mobic, and ordered an

MRI of the knee. (Tr. 712-13). Plaintiff followed up with Dr. Morton on May 16 and 27, 2016. She complained of low back pain on both occasions. Dr. Morton ordered an MRI of Plaintiff's spine, which showed bulging discs. He opined that Plaintiff's pain derived from her neck rather than her back. Dr. Morton also reviewed the MRI of Plaintiff's left knee and assessed her with a complex tear of the medial meniscus of the left knee, petallofemoral arthritis of the left knee, and pigmented villondular synovitis of the left knee, for which she received a steroid injection. (Tr. 706-08).

## Analysis

Plaintiff contends the ALJ erroneously failed to articulate her limitations with standing and walking. ALJ Heimann found Plaintiff could perform light work but could only "stand and walk 4 hours out of 8 hours." (Tr. 17). Plaintiff posits that this language creates an ambiguity as to whether Plaintiff can stand for four hours *and* walk for four hours in an eight-hour workday, or stand *or* walk for a *total* of four hours in an eight-hour workday.

The resolution of this dispute is a non-starter. The ALJ determined Plaintiff was not disabled because she had the RFC to meet the demands of her previous job as a traffic clerk, as both generally and actually performed. (Tr. 23-24). Plaintiff testified that the position required her to be on her feet less than two hours each day. (Tr. 88). Moreover, the Dictionary of Occupational Titles classifies a traffic clerk as sedentary employment, involving "walking or standing for brief periods of time." DICTIONARY OF OCCUPATIONAL TITLES 221.367-078 (4th

ed. 1991). Surely, standing and walking for eight hours (the entirety of the workday) does not constitute a "brief" period. "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The ALJ's assessment was clearly not erroneous on these grounds.

Plaintiff next argues the ALJ erred in evaluating the evidence of her heel spurs, carpal tunnel syndrome, and allegations of pain. She argues the ALJ should have included more limitations related to those conditions in her RFC and in the hypotheticals posed to the VE at the evidentiary hearing. Plaintiff, however, does not point to any evidence the ALJ ignored or mischaracterized. Instead, she regurgitates medical records and makes blanket assertions that a more restrictive RFC was warranted.

On review, the Court does not reweigh evidence or substitute its own judgment for that of the Commissioner's. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). Moreover, it is certainly not the Court's place to make or develop arguments on behalf of a party. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("underdeveloped, conclusory, or unsupported" arguments are waived). Nonetheless, the ALJ's evaluation of the evidence is logical and founded on substantial evidence.

ALJ Heimann determined Plaintiff's heel spurs did not prevent her from maintaining employment because her treatment was conservative and her activities of daily living were inconsistent with a finding of disability. (Tr. 23).

Plaintiff cites opinions from Dr. Needleman, her treating podiatrist, to argue she was, in fact, disabled. However, the ALJ properly gave these opinions limited weight.

"An ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability[;]" a standard the Seventh Circuit has deemed "lax." *Berger v.* Astrue, 516 F.3d 539, 545 (7th Cir. 2008). The Regulations instruct ALJs to weigh medical opinions in consideration of whether the physician actually examined the claimant, the length and frequency of examination, and supportability and consistency of the opinions. 20 C.F.R. § 404.1527(c).

In April 2013, Dr. Needleman opined Plaintiff could work for four hours every three days. In May 2013, he stated Plaintiff should get a sit-down job or be on disability. The ALJ did not adopt Dr. Needleman's opinions because they were based on just two evaluations of Plaintiff, were inconsistent with Plaintiff's ability to go on four-mile bike rides and walk her dogs each day, and were contradicted by consultative findings. ALJ Heimann also noted that at the time Dr. Needleman rendered his opinions, Plaintiff was working four-hour shifts and standing to do her job. (Tr. 22-23).

In September 2013, Dr. Needleman once again opined that Plaintiff needed to be on disability. Then, in May 2014, Dr. Needleman stated Plaintiff would be absent only intermittently from work and/or would need to work less than a full schedule due to pain, and should be able to wear sandals and sit and stand when

needed.  The ALJ found these opinions inconsistent and unsupported.  (Tr. 20, 22).

ALJ Heimann thoroughly summarized Dr. Needlman's records and provided valid reasons for discrediting his opinions, including inconsistency, supportability, and the length of the treatment relationship.  Plaintiff has failed to show that substantial evidence did not support the ALJ's decision.

The ALJ also adequately considered Plaintiff's complaints of pain.  The Regulations require an ALJ to consider several factors when assessing a claimant's allegations of pain, including the nature and intensity of pain, precipitation and aggravating factors, dosage and effectiveness of pain medications, other treatment for pain relief, functional restrictions, and the claimant's activities of daily living.  20 C.F.R. § 404.1529.  ALJ Heimann acknowledged Plaintiff's complaints of pain and aggravating factors such as prolonged periods of standing.  (Tr. 18-19).  He also noted corroborative MRIs and prescriptions for pain medication.  (Tr. 20).  However, due to Plaintiff's activities of daily living and other medical opinions in the record, the ALJ determined that Plaintiff's pain did not rise to the debilitating level she alleged.  (Tr. 21-22).  The ALJ analyzed Plaintiffs' subjective complaints in accordance with the Regulations.  His decision on this point was not erroneous.

Plaintiff further argues the ALJ failed to account for her carpal tunnel syndrome in the RFC, even though she testified at the hearing that she had no problems using her hands.  (Tr. 57-58).  Nonetheless, the ALJ discussed

Plaintiff's carpal tunnel syndrome at length and concluded the evidence did not support restrictions with fine or gross hand manipulations. (Tr. 19-20). To support his determination, ALJ Heimann noted that Plaintiff's treating physician, Dr. William Strecker, indicated that even prior to her carpal tunnel surgery, Plaintiff could work a full time job. The ALJ also deferred to Dr. Mirly, Plaintiff's surgeon, who opined Plaintiff could return to work with no restrictions shortly following surgery. (Tr. 22). The evidence overwhelmingly supports the ALJ's decision to not include limitations in the RFC related to Plaintiff's carpal tunnel syndrome.

In sum, the ALJ did not erroneously assess the medical evidence and Plaintiff has failed to show that a more restrictive RFC was warranted. Furthermore, the ALJ's hypotheticals to the VE were also sufficient because they accounted for all of the limitations the ALJ found credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) ("the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible").

Plaintiff further argues the ALJ's decision was erroneous because he did not mention her anxiety diagnoses at Step 2. "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment." *Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015) (internal quotations and citations omitted). Here, ALJ Heimann considered Plaintiff's "mental impairment of depression" at Step 2. Although the ALJ did not

specifically mention Plaintiff's anxiety, he provided a review of the record related to her overall mental health. Additionally, the ALJ found Plaintiff had several severe impairments and mentioned her anxiety later in his opinion, so any error at Step 2 does not warrant remand.

Plaintiff also points to portions of the record where she complained of stress or anxiety, which the ALJ did not cite in his opinion. The ALJ, however, is not required to mention every piece of evidence so long as he does not ignore an entire line of evidence contrary to his ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). ALJ Heimann acknowledged Plaintiff's complaints related to her mental health, (Tr. 16-17), and nothing suggests the ALJ cherry-picked from the record to reach his conclusions. Plaintiff even testified that her anxiety and depression would not prevent her from working. (Tr. 67-68). Her argument, here, is futile.

Next, Plaintiff asserts the ALJ should have more fully developed the record on her anxiety. "[T]he ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). This requires an ALJ to make a reasonable effort to obtain a claimant's medical records to ensure there is enough information to make a disability determination, *Martin v. Astrue*, 345 F. App'x 197, 201 (7th Cir. 2009) (citing 20 C.F.R. § 416.912(d) and 416.927(c)(3)). However, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records . . . ." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

Plaintiff, here, was represented by counsel during the evidentiary hearing. ALJ Heimann discussed the record with Plaintiff's attorney prior to commencing the hearing and specifically asked, "Counsel, you're satisfied the record is complete?" Counsel stated, "No objection. I'm awaiting records from Dr. Morton, who's an orthopedic doctor, who had replaced her hip and had taken some fluid off of her knee. And she's about to go back and obtain some additional information." (Tr. 40-41). Neither Plaintiff nor her attorney mentioned the need for more records related to Plaintiff's anxiety. "While it is true that the ALJ has a duty to make a complete record, this requirement can reasonably require only so much." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). The transcript shows ALJ Heimann attempted to make as completed a record as possible. Moreover, Plaintiff does not identify how Dr. Herrmann's records would have changed the outcome of the case. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelms*, 553 F.3d at 1098 (7th Cir. 2009) (internal citations omitted).

Finally, Plaintiff asserts that even if she was not disabled as of the date of the ALJ's decision, she was disabled, at least, from October 2013 through January 2015. A claimant need not be disabled as of the date of the hearing or the ALJ's decision in order to qualify for benefits, as long as she was disabled for any continuous period of at least 12 months. 20 C.F.R. § 404.1505(a).

ALJ Heimann did not explicitly consider this closed period because Plaintiff did not allege a closed period of disability. Regardless, "[t]he ALJ's discussion of

the medical evidence from that period makes evident" his conclusion that Plaintiff was not disabled from October 2013 through January 2015. *Reed v. Colvin*, 656 F. App'x 781, 788 (7th Cir. 2016). For the same reasons as stated above, Plaintiff has not shown that the ALJ's determination was erroneous.

Plaintiff takes issues with the way in which the ALJ interpreted the record, but does not point to any error in his logic or in carrying out the five-step analytical process for determining disability benefits. The Court does not and cannot make its own disability determination on review or reweigh the evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Rather, Plaintiff must show that substantial evidence does not support the ALJ's decision. *Id.* Plaintiff has not made this showing here.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: July 17, 2018.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**